IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

FIRST DAKOTA NATIONAL BANK,

Plaintiff,

vs.

ECO ENERGY, LLC f/k/a ECO ENERGY, INC., a Tennessee limited liability company,

Defendant.

8:13-CV-270

MEMORANDUM AND ORDER

This matter is before the Court on the cross-motions for summary judgment filed by plaintiff First Dakota National Bank ("First Dakota") and defendant Eco Energy, LLC ("Eco"). Filings 33 and 37. For the reasons discussed below, First Dakota's motion for summary judgment (filing 33) will be denied, and Eco's motion for summary judgment (filing 37) will be granted in part and denied in part.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might

affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. FACTUAL BACKGROUND

This dispute arises from the 2012 shutdown of an ethanol plant near Atkinson, Nebraska, formerly owned and operated by Nedak Ethanol, LLC ("Nedak"), a Nebraska company. It involves a lease of railcars by Nedak from Eco, a Tennessee company that is engaged in the business of marketing, distributing, and transporting biofuels, such as ethanol. Plaintiff First Dakota is a South Dakota-based bank which, through a series of transactions, acquired the rights of Nedak and its original lender under its loans to Nedak, the railcar lease, and various other agreements. In this suit, First National brings a claim for damages based on alleged violations of Nedak's rights under the railcar lease and the rights of Nedak's original lender arising from a 2007 agreement between Nedak, its lender, and Eco.

### A. The Original Arrangement Between Nedak and Eco

Nedak was formed in 2003, began construction of its plant in 2006, began production in 2008, and ceased production in June 2012. Filing 35-8 at 5. Funds to construct and operate the plant were borrowed from Farm Credit Services of Grand Forks, FLCA, which later became AgCountry Farm Credit Services, FLCA (collectively, "AgCountry"). Filing 34 at ¶¶ 4–5.

In November 2006, Nedak and Eco entered into an ethanol marketing agreement (the "Marketing Contract"), under which Eco agreed to transport and sell all of the ethanol produced by Nedak. Filing 34 at ¶ 8; filing 35-3 at 12, 18. To transport Nedak's ethanol, Eco used railcars which it had previously leased from a third party, Union Tank Car Company ("Union"), under what the parties have dubbed the "Primary Lease." Filing 35-3 at 1. The lease covered 133 railcars, with monthly lease rates ranging from $400 to $735, and with the lease terms for most of the railcars expiring between 2017 and 2020. Filing 34 at ¶¶ 9–10; filing 35-3 at 1. Nedak agreed that, if the Marketing Contract were terminated, Nedak would assume responsibility for the remaining term of Eco's lease with Union. Filing 35-3 at 20.

B. THE COLLATERAL ASSIGNMENT

In 2007, Nedak assigned all of its rights under the Marketing Contract to AgCountry (the "Collateral Assignment"). Filing 34 at ¶ 11. Nedak assigned all of its rights and remedies under the Marketing Contract, as well as "all agreements, documents, certificates, instruments, legal opinions and other materials relating thereto (collectively, together with the [Marketing Contract], the '***Assigned Documents***') and . . . all proceeds thereof, including without limitation, [Nedak's] rights and remedies with respect to any breach by any party to the Assigned Documents." Filing 35-6 at 5.

The Collateral Assignment included a consent, notice, and cure provision which was executed by Eco. Filing 34 at ¶ 12; filing 35-6 at 9. That clause provided, in relevant part:

> [Eco] agrees to give Leader prompt written notice of any default under the Assigned Documents [by Nedak] and to allow Lender a reasonable period of time to cure any such defaults should Lender elect to effect such cure. . . . Consent to the foregoing assignment is hereby granted in all respects.

Filing 35-6 at 9.

C. NEDAK TERMINATES THE MARKETING CONTRACT AND SIGNS THE SUBLEASE

In 2010, Nedak decided to switch from Eco to another ethanol marketing company, Tenaska Biofuels, LLC ("Tenaska"). Filing 34 at ¶ 6; filing 35-8 at 10; filing 35-12 at 8. Accordingly, in November 2010, Nedak and Eco agreed to terminate their Marketing Contract. To do so, they executed a "Termination Agreement." Filing 34 at ¶ 13; filing 35-3 at 22.

The Termination Agreement began with a number of recitals, including an acknowledgement that it was Nedak's responsibility, under the Marketing Contract, to assume responsibility for the remaining term of Eco's lease with Union. *See* filing 35-3 at 20, 22. To fulfill that obligation, Nedak agreed to enter into a new sublease (the "Sublease"), whereby it would sublease the railcars from Eco. Filing 34 at ¶ 14; filing 35-3 at 23, 28; filing 35-7 at 10. Nedak agreed to sublease the railcars from Eco for the same rent and for the same duration as under the Primary Lease between Eco and Union. Filing 35-3 at 28–29.

In addition to becoming Nedak's marketer, Tenaska became an investor in Nedak. Around 2011, Nedak was facing financial difficulties and needed new investment. Filing 35-8 at 11. Tenaska's wholly owned subsidiary, TNDK, LLC ("TNDK"), invested in Nedak in 2011, taking a 33 percent interest in Nedak and two seats on its board of directors in exchange for an

equity contribution of $5 million. Filing 34 at ¶ 7; filing 35-10 at 77; filing 35-12 at 6.

D. DETERIORATION OF NEDAK AND ECO'S RELATIONSHIP UNDER THE SUBLEASE

From 2010 to 2012, Nedak and Eco operated under the Sublease with no apparent difficulties. Eco billed Nedak for the railcars' rent via monthly invoices, which Nedak duly paid. Filing 34 at ¶¶ 16–17; *see, e.g.*, filing 35-3 at 40–47. But in the months leading up to May 2012, Nedak was facing financial difficulties. In May or June, Nedak decided that it would idle its plant until market conditions improved. Nedak advised AgCountry of this decision, and it froze Nedak's accounts, leaving Nedak unable to pay its bills, including the May invoice from Eco. Filing 35-8 at 18; filing 35-12 at 11.

By May 2012, the rental term for several of the original railcars had expired, and 96 cars remained under the Sublease. *See* filing 35-3 at 49–52. On May 31, Eco issued an invoice for May's rent, for $67,685, with payment due by June 13. Filing 34 at ¶ 18; filing 35-3 at 47. But by June 13, Nedak had not paid. Filing 34 at ¶ 19.

On June 19, 2012, Brian Downey, a "Transportation Manager" with Eco, e-mailed Nedak's CEO, Jerome Fagerland, expressing concern about Nedak's failure to pay. Downey noted that the railcar market had become "extremely tight due to the crude industry leasing many of the available cars." Filing 35-3 at 60. And he stated that if payment was not received promptly, Eco would need to take its railcars elsewhere. Filing 35-3 at 60. Fagerland responded the next morning, promising to transfer the funds in the next day or two. However, the bank refused to release the funds, and no payment was forthcoming. Filing 35-3 at 60, 64; filing 35-8 at 18–19, 25.

Downey and Fagerland then discussed the possibility of Tenaska stepping in and taking over the Sublease for Nedak. Eco was willing to consider the swap, but only on the understanding that the Sublease would be terminated and a new agreement, with new terms, would be entered into between Tenaska and Eco. *See*, filing 35-3 at 64; filing 35-4 at 3, 6. On June 21, Downey sent Fagerland a formal notice of default, stating that "[i]f payment is not received or other arrangements made, Eco-Energy will have to insist that its assets be returned. Please discuss with Tenaska the option of transferring the sublease arrangements and report back to me as soon as possible." Filing 35-3 at 64.

Shortly after receiving the letter, Fagerland responded by e-mail that he had forwarded the letter to Tenaska and was waiting to hear back from them. Filing 35-3 at 66. Eco and Tenaska engaged in discussions. *See, e.g.*, filing 35-3 at 67–72; filing 35-4 at 3–6. But they were unable to come to a deal in time to save Nedak's Sublease. In a letter dated June 25, 2012, and e-

mailed the same day, Eco notified Nedak that Eco was terminating the Sublease for Nedak's failure to pay, and demanded the immediate return of all railcars. Filing 35-4 at 10–11.

By June 26, 2012, Eco had located a new potential lessee, Mercuria Energy Trading, who wanted the railcars for transporting crude oil, and was willing to sublease all 96 cars at $2,500 or $2,600 per car for 2 years. Filing 34 at ¶ 17; filing 38 at 17, ¶ 24; filing 35-2 at 36; filing 35-4 at 12, 33. This was a significant increase from the $400 to $700 per month that Eco was receiving from Nedak. Downey testified that around this time, "crude oil was a new booming user of railcars, and their pockets were deep and they were paying astronomical prices for railcars." Filing 35-2 at 22.

On June 28, 2012, Eco sent a letter demanding immediate payment for the combined rent for May and June, totaling $135,370. Eco claimed that Nedak had utilized all 96 cars for the month of June, and so Eco was requesting the full month's rent. Filing 35-4 at 36; filing 35-7 at 36. The letter stated that additional invoices would follow for the period from July 1, 2012, until the date the cars were placed in service by Eco. Filing 35-4 at 36.

E. TENASKA'S ATTEMPT TO CURE NEDAK'S DEFAULT

In a letter dated July 3, 2012, Nedak suggested to Eco, for the first time, that perhaps Nedak was not yet in default under the Sublease. Filing 35-5 at 10; filing 35-8 at 22. Nedak cited § 4.07 of the Primary Lease, which, Nedak asserted, had been incorporated into the Sublease. Filing 35-5 at 10. Under § 4.07, before Union could terminate the Primary Lease for any failure to pay by Eco, Union was required to provide Eco with written notice and 15 days to cure the default. Filing 35-3 at 9. In its letter, Nedak claimed that Eco's first written notice of default was the letter of June 21, and so Nedak had until July 6 to cure the late payment, which it intended to do. Filing 35-5 at 10.

Although the July 3 letter was signed by Fagerland and printed on Nedak letterhead, Fagerland admitted that Tenaska was the moving force behind the letter. Filing 35-8 at 23, 26–27. And on July 6, it was Tenaska, acting on behalf of Nedak, which paid Eco the $135,370 owed. By a letter to Eco dated the same day, Nedak claimed that any default had now been cured and that it was entitled to continue leasing railcars under the Sublease. Filing 35-5 at 32–34.

Eco disagreed with Nedak and Tenaska's interpretation of the Sublease, and maintained that the Sublease had been validly terminated. *See, e.g.* filing 35-5 at 22, 63. And on July 13, 2012, Eco executed a new sublease with Mercuria for 2 years, for between 80 and 96 of the railcars, at a monthly rental of $2,600 per railcar. Filing 34 at ¶ 28; filing 35-5 at 57.

Nedak never resumed operations, and in January 2013, its lender, AgCountry, foreclosed. Filing 35-11 at 4. Various assignments and transactions followed, such that First Dakota now holds any rights that Nedak may have against Eco for any breach of the Sublease, as well as any rights that AgCountry may have had for any breach by Eco of the notice and cure provision in the Collateral Assignment. Filing 34 at ¶¶ 29–33. In the present lawsuit, First Dakota is asserting claims for both of these alleged breaches.

## III. ANALYSIS

In its first claim, First Dakota contends that Eco breached the Sublease by terminating it prematurely and without affording Nedak the right to cure its late payment. Specifically, First Dakota argues that the Sublease incorporated the 15-day notice and cure provisions of the Primary Lease, and that Nedak cured any default by paying the amounts owed within that grace period. In its second claim, First Dakota argues that Eco breached the promise it made in the Collateral Assignment, to provide Nedak's lender with notice and a reasonable opportunity to cure any default by Nedak under an "Assigned Document." First Dakota claims that, as a result of these breaches, Nedak's original lender lost the opportunity to put the railcars to productive use for the remainder of the Sublease. First Dakota seeks as damages the difference between the lease rate and the market value of the railcars at the time of termination, for the remainder of the Sublease. *See* U.C.C. § 2A-519.

The Court finds that the notice and cure provisions of the Primary Lease were not incorporated into the Sublease, and so First Dakota's first claim fails as a matter of law.[1] But First Dakota's second claim fares better. The Court finds that the Sublease meets the definition of an Assigned Document under the Collateral Assignment, and that Eco breached its promise to give Nedak's lender the required notice and opportunity to cure. However, questions of fact remain on the issue of causation. Thus, neither party is entitled to summary judgment on First Dakota's second claim.

The parties also disagree as to the market value of the railcars and whether Eco is entitled to any offset for rent due for certain railcars which remained in Nedak's possession until August 2012. But because questions of

---

[1] Because the Court finds there was no cure period, it need not address Eco's argument that its e-mail of June 19, 2012 constituted sufficient notice, such that the cure period actually expired on July 5. Similarly, the Court has no cause to consider Eco's further counter-arguments: that Nedak repudiated the Sublease prior to its termination, that Nedak waived any right to cure prior to July 3, and that Nedak should be equitably estopped from asserting such a right.

fact remain as to liability, the Court does not reach the parties' arguments concerning damages.

A. THE SUBLEASE DID NOT INCORPORATE § 4.07 OF THE PRIMARY LEASE

The parties agree that, pursuant to a choice of law clause, Tennessee law controls the Court's interpretation of the Sublease. Filing 35-3 at 30. And because the Sublease is a lease of commercial goods, it is governed by Article 2A of the Tennessee Uniform Commercial Code (U.C.C.). *See* Tenn. U.C.C. § 47-2A-102. Under Tennessee law, the interpretation of a lease, as with any contract, is a question of law. *See Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889 (Tenn. 2002). In resolving disputes concerning contract interpretation, the Court's task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language. *Id.* at 889–90.

The Court initially determines the parties' intent by examining the plain and ordinary meaning of the written words that are contained within the four corners of the contract. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). The literal meaning of the contract language controls if the language is clear and unambiguous. *Id.* However, if the terms are ambiguous in that they are susceptible to more than one reasonable interpretation, the Court must apply other established rules of construction to aid in determining the parties' intent. *Id.* The meaning of the contract becomes a question of fact only if an ambiguity remains after applying the appropriate rules of construction. *Id.*

The Sublease itself does not specify what should occur in the event Nedak fails to make a lease payment. Nor, by its own terms, does it require Eco to give Nedak notice and an opportunity to cure any late payment. Instead, First Dakota argues that the Sublease incorporated the 15-day notice and cure requirements of § 4.07 of the Primary Lease. First Dakota points to § 5 of the Sublease, under which Nedak "agrees and confirms that it shall be bound by all of the terms of and assumes all of the duties and obligations of Eco under the [Primary Lease], except as specifically provided herein." Filing 35-3 at 29. First Dakota argues that by agreeing to be "bound by all the terms of" the Primary Lease, Nedak undertook the duties and obligations of Eco under the Sublease, but took these duties subject to any corresponding rights of Eco, or at the very least, limitations on Eco's duties and obligations under the Primary Lease. And, First Dakota argues, Eco's duty to pay under the Primary Lease was subject to a 15-day grace period.

The Court finds First Dakota's interpretation of the Sublease unpersuasive. Stated plainly, § 5 of the Sublease says that if Eco is obligated to perform a duty under the Primary Lease, then Nedak must perform the

same, under the Sublease. And § 4.07 of the Primary Lease did not impose an obligation on Eco. It imposed a duty upon Union to give Eco notice. Or stated differently, it conditioned Union's right to terminate the Primary Lease or bring suit for damages on Union's having given notice and 15 days to cure. But § 4.07 did not impose a duty upon Eco, and so it was not incorporated by § 5 of the Sublease.

There is another problem with First Dakota's argument, regardless of how § 4.07 of the Primary Lease is characterized. The portion of § 5 at issue addresses only Nedak's role under the Sublease: if Eco had a duty under the Primary Lease, Nedak agreed to bear the same duty *to Eco* under the Sublease. But for § 5 to mean what First Dakota would have it mean, it would have to state that Eco was agreeing to assume the duties and obligations of Union under the Primary Lease. Section 5 contains no such language, and the Sublease did not require Eco to provide any notice, let alone the 15 days' notice and opportunity to cure set forth in the Primary Lease.

More broadly, First Dakota argues that the entire Primary Lease was somehow incorporated into the Sublease (with the exception of any specific, conflicting portions of the Sublease). First Dakota points to the recitals contained within the Sublease, which mention the Primary Lease, and Eco's obligations under it. And First Dakota notes that the Primary Lease was attached as an exhibit to the Sublease. First Dakota then points to § 1 of the Sublease, which states that "the recitations and statements set forth above are restated herein, incorporated hereby and made part of this Agreement." Filing 35-3 at 28. This, First Dakota argues, shows that the terms of the Primary Lease have been wholly incorporated into the Sublease.

This argument is contradicted by the plain text of the Sublease. Section 1 does not state that the terms of the Primary Lease have been incorporated, only the terms of certain recitals. Nor do the recitals incorporate the entire terms of the Primary Lease. Instead, the recitals acknowledge the Primary Lease's *existence*, as well as certain basic obligations of Eco under the Primary Lease—that Eco has leased the cars from Union and that Eco must obtain Union's consent before subleasing them. Filing 35-3 at 28.

The same can be said for First Dakota's argument concerning § 8 of the Sublease. That section states that the requirements of the Primary Lease remain in effect except as specifically provided in the Sublease. Filing 35-3 at 29. Again, this does not show that the Sublease incorporated the entirety of the Primary Lease. Rather, this section serves two other purposes. First, it acknowledges that the Primary Lease between Eco and Union remains in effect. Second, it means that the terms which bind Nedak under § 5 remain as stated in the Primary Lease, unless varied in the Sublease.

First Dakota next advances something that resembles a course-of-performance argument. First Dakota asserts that the terms of the Primary Lease governed a wide variety of "operational details," and that this shows the parties' intent to wholly incorporate the Primary Lease. For example, Downey (Eco's Transportation Manager) testified that Nedak's rent would be abated for periods when a car was taken out of service for routine maintenance. Filing 35-2 at 12–13, 19. Such a provision appears in the Primary Lease (but not the Sublease). *See* filing 35-3 at 4.

This final argument is a non-starter. The "operational details" that Nedak points to involve duties placed upon Eco by the Primary Lease—such as the duty to pay rent. And Nedak had accepted those duties. So it makes sense that those duties would be governed by terms contained in the Primary Lease. But nothing about this suggests that the entirety of the Primary Lease was incorporated, let alone that Eco somehow also accepted Union's obligation to provide notice and cure—an obligation contained in an entirely separate provision of the Primary Lease.

In sum, the Court finds that First Dakota's position is unambiguously contradicted by the text of the Sublease. The Court notes that a contract is not ambiguous merely because the parties to the contract may interpret the term in different ways. *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005). Ambiguity only arises if there exists more than one reasonable interpretation. *Dick Broad. Co.*, 395 S.W.3d at 659.

Even if § 5 of the Sublease could be said to contain some ambiguity—which it does not—then its meaning would become a question of fact. *Id.* The Court could then turn to extrinsic evidence, such as the parties' conduct and statements regarding the disputed provision, to ascertain the meaning of the contract. And the undisputed evidence on this point solely supports Eco's interpretation of the Sublease. Chadwick Conn (Eco's Vice President of Operations), who drafted the Sublease, testified that he drafted § 5 specifically in order to bind Nedak to Eco's obligations under the Primary Lease, but to not pass on Eco's rights under the Primary Lease. *See* filing 35-7 at 11–14, 17–18. In contrast, Fagerland, who executed the Sublease for Nedak, testified that he did not recall much regarding the execution of the agreement, and admitted that he had no particular understanding of the relationship between the Primary Lease and Sublease. Filing 35-8 at 13–16.

Nothing in the Sublease required Eco to provide Nedak with notice or an opportunity to cure. In the absence of any provision in the Sublease, the parties' rights are governed by Article 2A of the U.C.C. And the U.C.C. provides that, except in certain circumstances not relevant here, a lessor or lessee in default under a lease contract is not entitled to notice of default. T.C.A. § 47-2A-502. And if a lessee fails to make a payment when due, the

lessee is in default, and the lessor is entitled to cancel the lease contract. T.C.A. § 47-2A-523(1)(a). Eco was therefore acting within its rights when it canceled the Sublease on June 25, 2012. Accordingly, First Dakota's first claim fails as a matter of law.

### B. THE 2007 COLLATERAL ASSIGNMENT CLAIM

#### 1. The Sublease Was an "Assigned Document"

As discussed above, under the 2007 Collateral Assignment, Nedak assigned to its lender its rights under the Marketing Contract, as well as its rights under any "Assigned Documents," which included the Marketing Contract and "all agreements, documents, certificates, instruments, legal opinions and other materials relating thereto." Filing 35-6 at 5. And Eco agreed to provide Nedak's lender with prompt written notice of any default by Nedak under an Assigned Document, and to allow the lender a "reasonable period of time" to cure any such default. Filing 35-6 at 9.

First Dakota asserts that the Sublease was an Assigned Document, and that Eco breached its promise to provide Nedak's lender with notice and an opportunity to cure. Eco does not dispute that it did not provide any notice to Nedak's lender. Filing 38 at 17, ¶ 23; filing 35-7 at 46–47. Apparently, in 2012, no one at Eco remembered that Eco had promised to do so. *See*, filing 35-7 at 46–47; filing 39-4 at 11. Instead, Eco argues that the Sublease did not qualify as an Assigned Document.

Pursuant to a choice-of-law clause, the Court's interpretation of the Collateral Assignment is governed by North Dakota law. Filing 35-6 at 8.

> Contracts are construed to give effect to the parties' mutual intent as it existed at the time of contracting. N.D.C.C. § 9–07–03. The parties' intent is ascertained from the writing alone whenever possible. N.D.C.C. § 9–07–04. "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." N.D.C.C. § 9–07–09. The circumstances under which the contract was formed and the matter to which it relates may be considered. N.D.C.C. § 9–07–12.

*Barrett v. Gilbertson*, 827 N.W.2d 831, 836 (N.D. 2013).

The Sublease qualifies as an assigned document because it was an agreement "relating to" the Marketing Contract. The ordinary meaning of the phrase "relating to" is a broad: "to stand in some relation; to have bearing or

concern; to pertain; refer; to bring into association with or connection with." *Cent. States Found. v. Balka*, 590 N.W.2d 832, 837 (Neb. 1999) (quotations omitted); *accord Contractors Ass'n of W. Va. v. W. Va. Dept. of Pub. Safety, Div. of Pub. Safety*, 434 S.E.2d 357, 369 (W. Va. 1993). The phrase implies that "there is a connection between two subjects, not that the subjects have to be the same." *Contractors Ass'n of W. Va.*, 434 S.E.2d at 369. "The clear import of these well-established standards is that the phrase 'relating to' is to be read broadly and should be interpreted as being comprehensive of the subject indicated." *Cent. States Found.*, 590 N.W.2d at 837.

The Sublease is connected with, and arises out of, the Marketing Contact. The agreements involve the same parties. The Sublease covers the same railcars used in the Marketing Contract. And the Sublease was executed to fulfill Nedak's promise, the Marketing Contract, to take responsibility for Eco's lease. The connection between the Sublease and the Marketing Contract is expressly stated in the Termination Agreement, which provided: "Eco and [Nedak] agree to comply with the terms of the [Marketing Contract] pertaining to transportation equipment by entering into a railcar sublease agreement . . . ." Filing 35-3 at 23; *see* filing 35-7 at 10–11. Applying the plain meaning of the phrase "relating to," the Sublease qualifies as an Assigned Document under the Collateral Assignment. This interpretation of the Collateral Assignment also squares with its underlying purpose: to thoroughly secure the bank's loan to Nedak. The broad drafting of the definition of "Assigned Documents" reflects an intent to provide the lender with a comprehensive interest in Nedak's assets.

Eco points out that the Sublease did not exist at the time the assignment was drafted. But that does not prevent the Sublease from qualifying as an agreement that relates to the Marketing Contract. Nothing in the definition of "Assigned Documents" limits the class of agreements to those existing at the time of the assignment. Moreover, the assignment was drafted in the context of ongoing relationships between Nedak and its lender and Nedak and Eco. The parties had no reason to believe, in 2007, that Nedak and Eco's business under the Marketing Contract would stop any time soon. And the bank had no reason to believe Nedak would, through some unforeseen windfall, pay off all its loans in the immediate future. In other words, the assignment was drafted with the expectation that the parties would continue to do business. And it would frustrate the purpose of the assignment—to comprehensively secure the bank's loan to Nedak—if the assignment did not cover other, related agreements that would arise throughout the course of the parties' continued relationship.

Additionally, the creation of the Sublease was foreseeable when the Collateral Assignment was executed. The Marketing Contract stated that,

upon its termination, the parties would form some agreement whereby Nedak would assume responsibility for the Primary Lease. That promise created a future burden (or benefit) that Nedak was entitled to assign in 2007—an assignment to which Eco expressly consented.

Because the Sublease qualified as an "Assigned Document," Eco was obligated to give Nedak's lender notice of Nedak's default and a reasonable opportunity to cure. Eco does not dispute that it failed to do so. First Dakota has therefore established the first two elements of its breach of contract claim: the existence of a contract and a breach of that contract. *Godon v. Kindred Pub. Sch. Dist.*, 798 N.W.2d 664, 668 (N.D. 2011). First Dakota must still prove that this breach caused it to incur damages. *Id.*

2. Causation

Eco argues that, even if it did fail to give Nedak's lender the required notice, First Dakota has failed to produce evidence that Nedak's lender would have actually stepped in and cured Nedak's default. The Court finds that what little evidence there is on this point creates a question of fact for the jury.

Nedak has presented evidence that, had it been allowed to maintain the Sublease, it could have generated some $7 million in profit, based on the difference between the rent it was paying Eco and the market rates for railcars from 2012 through the remainder of the Sublease. *See*, *e.g.*, filing 35-13; filing 35-14. As it was, Nedak went out of business and its lender was forced to foreclose on its assets, leaving it with a deficiency of approximately $15 million. Filing 35-11 at 12. The ability to lease railcars for $800 and sublease them for $2,500, and to make $7 million in the process, provided the lender with ample incentive to step in and cure Nedak's default. And a jury could reasonably conclude that, had it received proper notice, Nedak's lender would not have let such an opportunity pass by.

Eco points to the fact that Nedak's lender did not, in fact, step in and cure the default. And while the lender may or may not have been aware of the impending default, or its consequences, the lender *did* know that Nedak was in financial trouble, and refused to release funds to pay the Sublease. *See*, filing 35-3 at 53, 64; filing 35-8 at 17–19. On the other hand, as First Dakota points out, there is a difference between learning that your borrower is in trouble and being notified by your borrower's other creditor that the borrower is about to default on a valuable railcar lease. And until such notice was received, the lender could have believed that the lease would stay in effect, especially where, as here, another party (Tenaska) had expressed a willingness to step in and pay. In short, based on the evidence in the record

at this time, the jury could reasonably find for either party on the issue of causation, and summary judgment is therefore inappropriate.

3. July and August Payments

One final issue remains to be addressed. Nedak was apparently in possession of some of the railcars through July and August 2012, for which it did not pay Eco any rent. *See*, filing 38 at p. 38, ¶¶ 19–21; filing 40 at p.7, ¶¶ 19–21. Eco asserts that it would be inequitable for the Court to award First Dakota relief when Nedak has failed to pay this rent, or, alternatively, that this was a continuing default that justified Eco's termination of the Sublease.

The Court finds both arguments unpersuasive. First, the Court fails to see the inequity of the situation. If Eco is correct, Nedak owes it perhaps $25,000—most of the railcars had been diverted to Mercuria by the end of July. Filing 35-2 at 53–54; filing 35-5 at 1, 67; filing 35-6. But if First Dakota is correct, Eco owes it approximately $7 million. What Eco labels "inequity" is actually a simple matter of providing an offset against First Dakota's claim. Second, even if the failure to pay for July or August amounted to a new breach or a continuing default, it would not (necessarily) affect First Dakota's surviving claim. If this was a default, then Eco was obligated to provide notice and an opportunity to cure to Nedak's lender. And Eco did not do so.

**IV. CONCLUSION**

First Dakota's first claim fails as a matter of contractual interpretation, and as to that claim, the Court will grant Eco's motion for summary judgment. First Dakota's second claim fares better as a contractual matter. But issues of fact remain regarding causation which preclude summary judgment for either party. Because liability has not been established, the Court finds it premature to wade into the issue of damages. Accordingly,

IT IS ORDERED:

1. First Dakota's motion for summary judgment (filing 33) is denied.

2. Eco Energy's motion for summary judgment (filing 37) is granted in part and denied in part, as set forth above.

Dated this 12th day of January, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge