IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FIRST DAKOTA NATIONAL BANK,<br><br>Plaintiff,<br><br>vs.<br><br>ECO ENERGY, LLC f/k/a ECO ENERGY, INC., a Tennessee limited liability company,<br><br>Defendant. | 8:13-CV-270<br><br>MEMORANDUM AND ORDER: FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter is before the Court after a bench trial on the plaintiff's breach of contract claim. For the reasons explained below, the Court finds that the plaintiff has failed to establish the required elements of its claim. Accordingly the Court will enter judgment in favor of the defendant and dismiss the plaintiff's complaint.

BACKGROUND

This case involves an ethanol plant formerly owned and operated by Nedak Ethanol, LLC. Prior to shutting its doors, Nedak defaulted on a contract with the defendant, Eco Energy, for the sublease of railcars. As a result of the default, Eco pulled its railcars from Nedak and diverted them to other companies.

In diverting the railcars from Nedak, Eco breached its obligation under a separate 2007 agreement between Nedak, Eco, and Nedak's lead lender, Farm Credit Services of Grand Forks (which later became AgCountry Farm Credit Services). Pursuant to that agreement, and as explained in more detail below, Eco was obligated to provide Nedak's lender notice of Nedak's default and a reasonable opportunity to cure. Because Eco failed to do so, the plaintiff contends that the defendant breached the 2007 contract, resulting in damages of $6,224,959.

Applying North Dakota law, this Court, in its January 12, 2015 Memorandum and Order, determined that the plaintiff had satisfied the first two elements of its breach of contract claim: the existence of a contract (the 2007 agreement), and a breach of that contract. But the Court left the remaining element—causation—for trial, holding that genuine issues of fact

remained as to whether AgCountry would have exercised its right to cure had it received appropriate notice of Nedak's default.

At trial, the plaintiff presented evidence suggesting that Nedak's lenders would have been ready, willing, and able to pay the default had AgCountry been presented with the appropriate notice and opportunity. Specifically, the testimony and evidence focused on three primary factors that, the plaintiff contends, "objectively confirm that making the cure was the only reasonable choice." Filing 60 at 3. These factors include (1) the financial incentive to the lender, (2) the importance of preserving Nedak's railcars, and (3) the ready availability of funds from several participating lenders.

The defendant contended, however, that AgCountry was unwilling to pour additional money into Nedak. To support this argument, the defendant presented evidence that Nedak, at the time of the default, was experiencing serious financial difficulties, causing concern amongst its lenders. These concerns prompted AgCountry to freeze Nedak's accounts, and maintain that freeze even after discovering that Nedak had defaulted on its sublease and was in jeopardy of losing its railcars.

After full consideration, and weighing the evidence, the Court finds that the plaintiff has failed to satisfy its burden on causation—that is, the Court finds that the plaintiff has not proven that AgCountry would have exercised its right to cure Nedak's default had it received proper notice and opportunity. Accordingly, the Court will dismiss the plaintiff's breach of contract claim.

## SUMMARY OF FACTS

### 1. THE CONTRACTS

#### (i) The Marketing Contract (2006)

In 2006, Nedak and Eco entered into an ethanol marketing agreement (the "Marketing Contract"), under which Eco agreed to transport and sell all of the ethanol produced by Nedak. Filing 69 at 9; ex. 2 at 1. To transport Nedak's ethanol, Eco used railcars which it had previously leased from a third party, Union Tank Car Company. That lease covered approximately 133 railcars, with monthly lease rates ranging from $400 to $735 per railcar. The lease terms on the railcars varied, with some expiring as early as 2012, and others as late as 2020. Ex. 5 at 8.

As part of the Marketing Contract, Nedak agreed to assume Eco's financial obligation to Union Tank Car in the event that the Marketing Contract was terminated. Specifically, the Marketing Contract provided: "If this Agreement is cancelled for may [sic] reason, NEDAK will be responsible to take over all rail contracts." Ex. 2 at 9.

### (ii) The Collateral Assignment (2007)

In 2007, Nedak assigned all rights and remedies under the Marketing Contract, and *all documents related thereto* (collectively, the "Assigned Documents"), to its lead lender, Farm Credit Services of Grand Forks. Ex. 1 at 1 (emphasis added). This contract (the "Collateral Assignment") also included a provision, executed by Eco, which provided the lender a right to notice and cure in the event of Nedak's default on the Assigned Documents. The provision provides in relevant part:

> [Eco] agrees to give Lender prompt written notice of any default under the Assigned Documents and to allow Lender a reasonable period of time to cure any such defaults should Lender elect to effect such cure. . . . Consent to the foregoing assignment is hereby granted in all respects.

Ex. 1 at 5. Farm Credit, as lead lender, held this right until it merged with AgCountry in 2008. The right was subsequently assigned to a company called Choice Ethanol Holdings LLC, and, ultimately, to First Dakota National Bank. *See,* filing 68 at 52- 54; ex. 10 at 1; ex. 11 at 1; ex. 13 at 1-2.

### (iii) The Sublease (2010)

In 2010, Nedak and Eco agreed to terminate the Marketing Contract. To do so, the parties entered into a termination agreement, which reflected a mutual desire for "a fair and equitable settlement with regard to the cancellation of the rights and obligations granted under the Marketing [Contract.]" Ex. 3 at 1. But the termination agreement was not absolute— indeed, it reaffirmed Nedak's responsibility "to reimburse Eco the cost associated with the lease of the ethanol railcars . . . if the [Marketing Contract] is cancelled for any reason[.]" Ex. 3 at 1.

To fulfill this obligation, the parties entered into a separate sublease (the "Sublease"), whereby Nedak agreed to sublease the railcars from Eco for the same rent and for the same duration as Eco's agreement with Union Tank Car. Ex. 5 at 1. Thus, pursuant to the Sublease, Nedak would make monthly payments to Eco, (ex. 2 at 2), which Eco could then apply to its outstanding balance with Union Tank Car. To this end, the terms of the Sublease accounted for both Nedak's obligation to Eco under the Marketing Contract, and Eco's obligation to Union Tank Car under its separate lease agreements.

This Court, in its January 12, 2015 Memorandum and Order, determined that the Sublease related to the Marketing Agreement, and was therefore subject to the notice and cure provision of the 2007 Collateral

Assignment. Filing 42 at 10. Accordingly, Eco was contractually obligated to provide Nedak's lender "prompt written notice" of Nedak's default on the Sublease, should it occur, and a "reasonable period of time to cure." *See,* filing 42 at 10; ex. 1 at 5.

(iv) <u>Deterioration of Nedak and Eco's Relationship Under the Sublease</u>

Nedak paid Eco pursuant to the Sublease without issue from 2010 to 2012. Filing 69 at 18, 57. By mid-2012, however, Nedak was experiencing financial difficulties, and in early June of that year, the company decided to idle its plant. Filing 68 at 103; filing 69 at 19. This decision was based on a combination of internal and market factors, and was intended—at least from Nedak's perspective—as a temporary event. Filing 69 at 37.

During the midst of its financial trouble, and shortly after its board of directors had decided to idle the plant, Nedak received its monthly invoice from Eco regarding the railcar sublease. *See* ex. 14. The invoice, which Eco sent to Nedak on June 5, 2012, and which covered Nedak's May sublease period, reflected a balance of $67,685.00, with payment due on or before June 13, 2012. Ex. 101; ex. 14.

Nedak did not pay the invoice, which prompted Eco, on June 14, 2012, to e-mail Nedak regarding the outstanding balance. In that correspondence, Kristen Hartmann, an "AR Collections Specialists" at Eco, e-mailed Michael Beatty, Nedak's Chief Financial Officer, to "confirm the payment . . . for the attached railcar lease fee invoice[.]" Ex. 15 at 1. Beatty responded the same day, claiming that Nedak was "waiting on bank approvals" and that it would "get back to [Eco]" the following week. Ex 15. On June 19, when Eco had not yet heard back from Nedak, it sent a second e-mail—this time to Jerome Fagerland, Nedak's President—expressing concern regarding Nedak's ability to pay the invoice, particularly in light of Nedak's recent financial difficulties. Ex. 16. The e-mail provided in part:

> [Eco has] spoken internally concerning the shutdown situation at Nedak. Great concern has been given to the railcars that Eco-Energy originally obtained for Nedak. As I am sure you know, the railcar market has become extremely tight due to the crude industry leasing many of the available cars. . . . [I]f payment is not received [by June 20, 2012], preparations for the return of the cars to Eco-Energy will need to begin.

Ex. 16 at 1. Fagerland responded, claiming that Nedak was "processing" the payment, and that Eco should receive it the following day. Ex. 16 at 1.

But that payment, too, was never sent, and Eco ultimately notified Nedak in a June 25, 2012 letter that it was terminating the Sublease. Ex. 21. The letter cited Nedak's failure to pay the invoice as a reason for the termination, and demanded the immediate return of all railcars. Ex. 21. Eco sent another notice to Nedak on June 28, 2012, notifying the company that it had "commenced the process of having the ninety-six (96) railcars . . . returned to the Eco-Energy fleet." Ex 27. The letter also demanded payment from Nedak in the amount of $135,370.00, which reflected its balance due for both May and June. Ex. 27.

By July 2012, Eco had diverted the railcars from Nedak to other companies, which, given the demand for railcars at that time, were paying upward of $2,500 per month, per car—a rate significantly higher than Nedak's fixed obligation under the Marketing Contract and Sublease. *See* filing 69 at 65.

Nedak never resumed operations, and in January 2013, its lender, AgCountry, foreclosed. Filing 68 at 51-52. As mentioned above, various assignments and transactions followed, such that First Dakota holds (and is now asserting) AgCountry's rights for any breach by Eco of the notice and cure provisions in the Collateral Assignment. *See,* filing 68 at 52; exhibits 10-13.

### 2. BREACH OF CONTRACT - CAUSATION

It is established that the Sublease was subject to the notice and cure provision of the 2007 Collateral Assignment. Filing 42 at 10. Accordingly, Eco was contractually obligated to notify AgCountry of Nedak's default on the Sublease, and provide the lender an opportunity to cure. Eco, by its own admission, failed to satisfy this obligation. But the Court left the issue of causation for trial, finding that genuine issues of fact remained as to whether AgCountry would have exercised its right to cure had it received appropriate notice of Nedak's default. Filing 42 at 12-13.

The plaintiff presented evidence that AgCountry and other lenders were ready, willing, and able to pay the default had those parties been presented with the appropriate notice and opportunity. The defendant, for its part, presented testimony indicating that AgCountry was unwilling to pour additional money into its investment, as evidenced by the lender's decision to maintain a hold on Nedak's accounts, despite its first-hand knowledge of the default. The Court will briefly summarize the parties' evidence as presented at trial.

The plaintiff sought to prove causation, at least in part, by focusing on the financial incentives bearing on AgCountry to maintain and preserve the terms of the Sublease. For example, Kevin Haselhorst, the Senior Vice

President at First Dakota National Bank (which was a participant lender in Nedak in 2012), testified to the lenders' discussions regarding Nedak's decision in mid-2012 to idle its plant. According to Haselhorst, the lenders understood Nedak's idling period to be a temporary event, in which the plant would "go idle, not produce ethanol[,] and simply wait for margins to improve." Filing 68 at 38-39. Given the temporary nature of this idling period, it was imperative that Nedak maintain the terms of its lease—after all, "if Nedak would start back up . . . producing ethanol, it needed railcars." Filing 68 at 43.

Haselhorst also testified that, had AgCountry received proper notice of Nedak's default, other participant lenders—including First Dakota—would have cured in order to maintain the Sublease. On this point, Haselhorst testified to a process whereby the lead lender (AgCountry) would notify participant lenders through presentation or conference call regarding "major issue[s] or servicing issue[s]" relating to Nedak, which included "loaning more money, advancing additional money, [and] letting collateral go[.]" Filing 68 at 26-27, 32. If the update required action from the lender group, then, according to Haselhorst, the parties would vote on the appropriate next steps. The voting power of each lender was proportional to its interest in the investment, and, according to Haselhorst, approving or disapproving certain actions required a majority vote. Filing 68 at 48.

Haselhorst testified that AgCountry notified the lender group of Nedak's plan to idle its plant, and its inability to pay bills, including the June 2012 invoice from Eco. Filing 68 at 38-39, 42. But, because AgCountry was purportedly unaware of Eco's plan to divert the railcars in the event of non-payment, the lenders were without sufficient information to grasp the severity of the default, and the consequences of non-payment. Put differently, and as Haselhorst testified at trial, knowing that a borrower has past due accounts is one thing, "but it brings a whole new element to a lender . . . if due to those past due accounts, there's collateral being lost or potential that it could be lost." Filing 68 at 45.

So, according to Haselhorst, had Eco provided proper notice and opportunity, AgCountry's memo and/or conference call to the participant lenders would have included discussion not only of Nedak's default, but also of the consequences of non-payment—that is, the potential for lost collateral. Filing 68 at 44-47. Armed with complete information, the lenders would have then voted on whether to release funds or otherwise cure Nedak's default. And, provided the importance of the railcars to Nedak's future operation, Haselhorst testified that—if provided the opportunity—First Dakota would, at a minimum, have supported a plan to cure the default. Filing 68 at 47.

The plaintiff also presented testimony from David Neubauer, President of Tenaska Commodities. Tenaska became involved with Nedak in 2010, when it began marketing Nedak's ethanol. Filing 68 at 90. Over time, Tenaska developed a more active relationship with Nedak, and, in 2011 or early 2012, it began managing the company's commodities. Filing 68 at 89-90, 97; ex. 8. As part of this arrangement, Tenaska assumed a management role over Nedak's railcar Sublease with Eco. Filing 68 at 91-95. It also made a $5 million direct investment in Nedak, acquiring approximately 33 percent equity in the company, and obtaining two seats on Nedak's board of directors. Filing 68 at 95-96.

In many respects, Neubauer's testimony echoed Haselhorst's. He, too, testified to the temporary nature of the board of director's decision to idle Nedak's plant, and the importance of maintaining access to the railcars in the event that Nedak reopened. Filing 68 at 99-100. Neubauer also testified to Tenaska's attempt, in or around early July 2012, to cure the default by advancing money to Nedak. Filing 68 at 104. Nedak then wired those funds to Eco, but, by that time, it was too late—Eco had already diverted the cars. The decision to advance Nedak funds, Neubauer claimed, underscored the importance of maintaining the railcars. Filing 68 at 104-105.

The defendant, on the other hand, presented evidence that AgCountry—the holder of the right at issue—knew not only of Nedak's default, but also the consequences of non-payment. Rather than proactively remedying the default, the defendant contends, AgCountry froze Nedak's accounts, refusing to release the funds necessary to pay the June 2012 invoice.

To establish AgCountry's knowledge of Nedak's default, the defendant called Jerome Fagerland, the former President and CEO of Nedak. Fagerland testified that, throughout mid-2012, he kept AgCountry apprised of the potential idling of the ethanol facility. Filing 69 at 23. Once the board officially decided to idle the plant, Fagerland said, AgCountry placed an immediate hold on Nedak's accounts. Filing 69 at 23. As a result, and given the timing of these actions, Nedak was unable to pay its May invoice with Eco. This, in turn, required Fagerland to correspond with AgCountry regarding the possibility of releasing funds to cover the invoice.

As established at trial, this correspondence between Fagerland and AgCountry regarding the potential release of funds occurred immediately after Nedak's default on the May invoice. Indeed, and as mentioned above, Eco sent Nedak an e-mail on June 14, 2012—the day after payment was due—seeking confirmation that Nedak did, in fact, intend to pay the invoice. Ex. 15. A Nedak employee responded to Eco the same day, claiming that the company was "waiting on bank approvals." *See,* ex. 15; filing 69 at 26-27.

Fagerland testified that this response—in particular, that it was "waiting on bank approvals"—related to Nedak's direct request of AgCountry that it release funds so that Nedak could pay the invoice. Filing 69 at 26. Thus, Fagerland's testimony establishes that AgCountry had knowledge of Nedak's default on the Sublease on or before June 14, 2012.

Fagerland also testified more generally to the link between his correspondence with Eco, and his communications with AgCountry. For example, and as earlier mentioned, Fagerland sent an e-mail to Eco on behalf of Nedak on June 20, 2012, in which he claimed that Nedak was "processing" its payment to Eco. Ex. 16. The next day, however, Fagerland informed Eco that AgCountry had not approved the funds, and that Nedak was therefore unable to pay. *See,* filing 69 at 27; ex. 18. When asked about these events, Fagerland testified that it was simply not possible to cure the default payment without AgCountry's assistance, and that he had specifically requested that the lender release funds to pay the Sublease—which both parties (AgCountry and Nedak) understood to be in default. Filing 69 at 28.

Overall, Fagerland's testimony touched on what was, in his opinion, AgCountry's general reluctance to assist Nedak during its mid-2012 financial downturn. Specifically, and with respect to Nedak's default on the May invoice, Fagerland opined that AgCountry's refusal to release funds evidenced its efforts to minimize losses on the investment. To this end, Fagerland testified that AgCountry "had made the decision that the ethanol plant was not going to survive and took steps to protect [its] interest[s] a[s] best they could." Filing 69 at 31.

The Court finds Fagerland's testimony credible and consistent with the weight of the evidence—that is, that AgCountry's primary concern in June 2012 was cutting its losses and protecting its interests. This conclusion is supported not only by Fagerland's first-hand account and informed opinion, but also by the circumstances surrounding Nedak's default. In particular, the Court cannot overlook the fact that, by all accounts, Nedak was experiencing serious financial difficulties in 2012. Indeed, Haselhorst described Nedak—at least as of 2012—as a company that was "burn[ing] quite a bit of cash . . . without a lot of money coming back in[.]" Filing 68 at 38. And while there may have been a profit motive in maintaining the railcars, the tenor and weight of the evidence has not convinced the Court that AgCountry would have pursued that route in the summer of 2012—or otherwise cured the default—if it had received proper notice under the 2007 Collateral Assignment.

The evidence also suggests that AgCountry was aware of Nedak's default, and the potential consequences of non-payment, before Eco's decision to divert the cars. As previously noted, Fagerland testified to discussing the

default with an AgCountry representative as early as June 14, 2012. Similarly, Haselhorst testified that, during mid-2012, there was "a great deal of communication between Tenaska and Nedak and then communication between Nedak and AgCountry[.]" Filing 68 at 69. As part of this communication, the parties discussed the importance of Nedak paying its bills, including the May invoice, as it prepared to idle the plant. Relatedly, Neubauer testified that he spoke directly with AgCountry regarding Nedak's default on the Sublease, and to the importance of paying the invoice to maintain access to the railcars. Filing 68 at 118. Neubauer indicated that, despite this conversation, AgCountry refused to release the funds to the Sublease. Filing 68 at 118.

Eco was also clear in its intention to divert the railcars in the event of non-payment. The company communicated as much to Nedak in a June 21, 2012 letter, in which Eco's transportation manager wrote that Eco would "insist that its assets be returned" if "payment is not received or other arrangements made." Ex. 106 at 1. In an e-mail sent the same day, the Eco employee informed Fagerland that "if payment is not received, preparations for the return of the cars to Eco-Energy will need to begin." Ex. 16 at 1. Shortly thereafter, when it became clear that Nedak would not be able to pay, Eco began diverting the cars. All 96 cars were eventually diverted to other companies, despite Nedak's efforts in early July pay the default.[1]

## DISCUSSION

The plaintiff claims that the defendant breached the Collateral Assignment by failing to provide Nedak's lender with notice of Nedak's default and a reasonable opportunity to cure that default before terminating the Sublease. Under North Dakota law, which governs this case, the prima facie elements of a breach of contract case are: (1) the existence of a contract; (2) a breach of the contract; and (3) damages which flow from the breach. *WFND, LLC v. Fargo Marc, LLC*, 730 N.W.2d 841, 848 (N.D. 2007).

As previously discussed, this Court held in its prior Memorandum and Order that the plaintiff had established the first two elements of its prima facie case. Specifically, the Court noted:

---

[1] In a letter dated July 3, 2012, Nedak suggested to Eco, for the first time, that perhaps Nedak was not yet in default under the Sublease. Ex. 32. Three days later, Tenaska (a Nedak investor) wired $135,370 to Eco on Nedak's behalf in an attempt to cure the default. *See,* ex. 34; ex. 35. Eco maintained its position that Nedak had, in fact, defaulted on the Sublease, and continued its process of diverting the railcars to other companies. This set of events gave rise to a separate breach of contract claim, which the this Court resolved in the defendant's favor in the January 12, 2015 Memorandum and Order. *See* filing 42 at 9-10.

> Because the Sublease qualified as an "Assigned Document," Eco was obligated to give Nedak's lender notice of Nedak's default and a reasonable opportunity to cure. Eco does not dispute that it failed to do so. First Dakota has therefore established the first two elements of its breach of contract claim: the existence of a contract and a breach of that contract.

Filing 42 at 12. But the Court left the issue of causation for trial, noting that, based on the evidence presented at that time, "[a] jury could reasonably find for either party." Filing 42 at 12-13.

Before applying these elements to the relevant findings of fact, the Court will address separate issues raised by the parties with respect to the remaining element of the plaintiff's claim.[2] First, the defendant encourages the Court to draw an adverse inference based on the plaintiff's "failure to present testimony from Randy Aberle of AgCountry, as to the action AgCountry would have taken had Eco-Energy provided it with written notice of Nedak's default." Filing 71 at 15. In other words, the defendant contends that because the contractual right at issue belongs to AgCountry, the plaintiff should have produced testimony from a representative of the lender regarding its intention to cure Nedak's default. Because the plaintiff failed to do so, the defendant argues, the Court should infer that AgCountry's testimony, if presented, would be adverse to Nedak. Filing 71 at 15.

The Court is aware that, in certain circumstances, an adverse inference may be warranted when a "party fails to produce the testimony of an available witness on a material issue in the case[.]" *Kostelec v. State Farm Fire and Cas. Co.*, 64 F.3d 1220, 1229 (8th Cir. 1995). But the Court need not, and will not, draw such an inference, particularly in light of existing evidence which supports the defendant's position.

The plaintiff has renewed an argument that it presented at summary judgment regarding causation. *See,* filing 60 at 2; filing 40 at 23-25. Specifically, the plaintiff contends that it need only establish that Nedak's lender "was owed a notice, did not receive one, and lost the opportunity to preserve its collateral as a result." Filing 60 at 3. In this respect, the plaintiff argues that the issue as presented at trial—whether AgCountry would have stepped in and cured Nedak's default—is "inherently speculative," and requires "reconstructive history." Filing 60 at 2. Accordingly, the plaintiff

---

[2] The Court has also considered the parties' objections at trial as to the relevance of certain exhibits and testimony. Although the Court did not rely on this evidence in reaching its decision, those objections will be overruled.

- 10 -

argues that "such proof should be unnecessary for First Dakota to prevail, because a breaching party's speculative contentions about the effect of an unissued notice should not defeat judgment." Filing 60 at 2.

To the extent that the plaintiff asks this Court to overlook a required element of its breach of contract claim—that is, causation—the Court will decline to do so. While the Court agrees that the nature of this dispute requires an element of 20/20 hindsight, that is not unusual in a contract dispute and it does not alter the necessary legal analysis with respect to the defendant's alleged breach of contract.

Nor is the Court persuaded by the two cases cited by the plaintiff in support of its position. First, the plaintiff cites *Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037 (M.D. Ala. 2006) for the proposition that "a breaching party's speculative contentions about the effect of an unissued notice should not defeat judgment." Filing 60 at 2. But the plaintiff's reliance on this case is misplaced. Indeed, to the extent that the *Lemuel* court addresses speculation vis-à-vis damages or causation, it is in the context of the standards governing summary judgment, not established principles of contract law: the plaintiff in *Lemuel* attempted to resist summary judgment by contending *without* supporting evidence that the defendant who had been deprived of notice might not have acted on the notice. *Id.* at 1068. In this respect, the *Lemuel* court's holding reaffirms the basic principle that a plaintiff cannot defeat a defendant's motion for summary judgment with speculative assertions that are unsupported by any record evidence. *Lemuel*, 414 F. Supp. 2d at 1068 (citing *Woods v. Paradis*, 380 F. Supp. 2d 1316, 1330 (S.D. Fla. 2005)). But as described above, this dispute, unlike *Lemuel*, contains ample evidence to support the defendant's position with respect to causation.

The plaintiff also cites *Andrews v. Sotheby Int'l Realty, Inc.*, 2014 WL 626968 (S.D.N.Y. Feb. 18, 2014) for the same proposition. But that case, too, is inapplicable to this dispute. In *Andrews*, the plaintiff sued his employer for breach of contract, arguing that the company failed to provide him proper 6-month notice, as was allegedly required by his employment contract, prior to his termination. To establish damages—a required element of the claim—the plaintiff argued that, had he received proper notice, he "could have explored" other opportunities. *Id.* at *6. The court determined that the plaintiff's vague assertion was "speculative" and therefore "insufficient to sustain [the] claim[.]" *Id.* But if *Andrews* is applicable at all, it supports the defendant's position that the plaintiff carries the burden of proving that a lack of contractual notice caused its damages. To this end, the *Andrews* court cites caselaw for the proposition that a plaintiff's "speculative optimism, concerning what 'could have and would have' happened, *cannot substitute for facts evincing direct causation and actual damages*." *Id.* (emphasis added)

(citing *Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*, 2009 WL 362118, at *6 (S.D.N.Y. Feb 9, 2009)). *Andrews* does not support the proposition for which it is cited by the plaintiff.

As a final matter, although the Court need not revisit the findings of fact that support this conclusion, it is worth noting that the contractual right at issue has, at all relevant times, belonged to AgCountry. And while the plaintiff presented evidence as to how other lenders would have responded— such as Tenaska and First Dakota—it failed to satisfy its burden with respect to the actual holder of the right.

## CONCLUSION

The Court finds that the plaintiff has failed to meet its burden on the final element of its breach of contract claim. Although Eco failed to satisfy its obligation under the 2007 Collateral Assignment, the evidence is insufficient to allow this Court to conclude that AgCountry would have exercised its right to cure had it received written notice. Accordingly, the plaintiff's claim is dismissed.

IT IS ORDERED:

1. The plaintiff's complaint is dismissed.

2. A separate judgment will be entered in favor of the defendant.

Dated this 8th day of November, 2016.

BY THE COURT:

John M. Gerrard
United States District Judge